Good morning, your honors, and may it please the court. My name is Sarah Yolman, and I'm the attorney for the plaintiff's appellants in this case. I'd like to reserve three minutes of my time for rebuttal, please. As you know, your honors, this case challenges a USDA interpretive rule published in 2005, excluding poultry from the Humane Methods of Slaughter Act of 1958. This is an act that requires all livestock to be slaughtered humanely. Plaintiffs challenge this rule as a violation of the Administrative Procedure Act and the plain language of the Humane Methods of Slaughter Act. Below, the district court found that plaintiffs had properly alleged standing under the motion to dismiss standard, and that plaintiffs were challenging a final agency action. However, the court rejected plaintiffs' argument on the merits, finding the exclusion of poultry to be proper. Let me ask you, is there in fact standing in this particular case?  And why isn't that a stopper? Certainly, your honor. As you know, the district court issued a lengthy opinion on finding that redressability was proper in this case. Just as the district court found, all we have to show is that it's likely that our injury will be redressed. Here, the Humane Methods of Slaughter Act mandates that livestock shall be slaughtered humanely. If plaintiffs prevail in this case, then this court will dis- That particular statute has no enforcement provision in it. The 1958 statute, no, your honor. It no longer has an express enforcement provision. So what's the, what's the, you know, in other words, the Secretary may, you know, enact regulations depending upon what we do here, but there's no requirement that anybody follow it. Well, your honor, as we've discussed in our reply brief, page 5, pages 5 to 6, the case law in the circuit indicates that no enforcement authority is necessary. We assume that third parties will comply with Federal law. This is the Otter's Hook Joe's case and supported by the Supreme Court Aiken's case. In that case, the- But here, in those cases, there were some line of authority. I mean, here, if USDA can't, doesn't have an enforcement mechanism, aren't you depending upon the goodwill of the very people who have no, who aren't before the court? I mean, you're depending upon chicken producers, right? Yeah. Poultry producers. To, I'm sorry. They'd be insulted by- I know, I'm sorry about that. Poultry producers to just say, oh, gosh darn. These folks out in San Francisco said that in 1958 and a statute that's been changed and superseded and monkeyed with a lot since, Congress really meant to include us, and so we'll do it. Well, your honor, there's two responses to that. There's two responses. First, as I indicated, the case law does instruct that we assume third parties will comply. But even beyond that, USDA has the ability to ensure compliance. It argues that it may decide to abdicate, it may decide never to enforce, but it nonetheless has enforcement authority. The district court found under the Federal Meat Inspection Act amendments of 2005, the Federal Meat Inspection Act provides for enforcement authority for humane inspection for a set list of animals. In 2005, that was amended to include whatever animals USDA decides that it does. But that isn't your suit. You didn't sue under that statute. You sued under a different statute, the one from 1958. So, I mean, it's nice that there are other statutes out there, but that's not this case. Well, your honor, the Federal Meat Inspection Act actually is directly connected to the main methods of slaughter act of 1958, expressly references that act and says that there's enforcement- The problem, again, is that at that point in time, the list of livestock, well, the list of animals that were recovered did not include poultry. And so, therefore, you know- Well, your honor, in 1958, there was enforcement authority in this act, then, that's procurement provisions. Yes. Those were repealed in 1958 when Congress gave authority under the Federal Meat Inspection Act, an act that now allows the agency to apply those humane provisions to whatever animals it decides that it's going to apply those to, including poultry. Well, then you basically would have to sue, again, under a different statute now than the one you sued here. Let me also ask you another problem with the rejectability aspect, as well, is the fact that a lot of what you're talking about, in terms of, you know, health, et cetera, is already covered by the Poultry Products Inspection Act, which already covers all this other area. So, the fact is that there's a question as to whether or not, even if we rule a particular way, the secretary might not promulgate anything that would affect your particular clients. Well, your honor, there's several questions in there. You know, our argument is that the Federal, or excuse me, the Humane Methods of Slaughter Act prohibits inhumane slaughter of animals. The Ninth Circuit, as well as the D.C. Circuit, has indicated that we assume that third parties are going to apply, comply. There is a threat of enforcement that is through the 2005 Federal Meat Inspections Act, and also through the procurement provisions. We discussed this in our reply brief on page eight. There's no threat unless the secretary amends or issues regulations under the, I can't remember the number now, the later act. In other words, there is no regulation that covers it now. There's no regulation that covers poultry. Right, your honor. But if this court finds that livestock or poultry, under the statute, the statute requires that poultry shall be slaughtered humanely. Essentially, the government's argument is that  that we should actually assume that parties aren't going to comply with Federal law to defeat redressability. No, the statute was that it doesn't cover poultry unless the secretary finds or issues a regulation which says, yes, it does cover poultry. No, your honor. Actually, the Humane Methods of Slaughter Act requires that all livestock be slaughtered humanely. Plainest request in this case is that the court declare that poultry are, in fact, livestock. The court's interpretation, and this is our merits argument, that we assume is correct. Let me ask you a hypothetical question about statutory construction. Sure. Suppose the statute made it a felony to steal cattle, calves, horses, mules, sheep, swine, or goats, and some guy gets caught stealing turkeys. Now, can he be indicted under that statute, making it a crime to steal live? Because the statute, title of the statute is livestock larceny. And then it goes to all the trouble, the legislature goes to all the trouble to enumerate these different animals. Now, I live in a part of Oregon where this is a very important statute. And the Oregon Supreme Court held that a statute like that did not include unnamed animals that are quite often stolen. Well, your honor, if this was a criminal provision, it would be different. As your honors know, criminal provisions are considered much more narrowly. They are much more narrowly construed. But aren't we reaching, aren't you asking us to reach out and put something in the statute that the legislature didn't put in? No, your honor. Our merits argument is that when Congress speaks in broad terms, we're instructed to interpret that broadly and apply it broadly. Here, Congress chose to list six specific animals, and then it chose the term and other livestock. In 1958, that definition expressly included farm animals. It is a very, very broad definition. We've asked the court to look at the plain language and to interpret it as broadly as Congress actually wrote it. I actually want to raise the US v. Park case. This was a case decided by the Ninth Circuit just last year. In that case, there was a deed, and there was a federal easement on that deed that restricted commercial activity to livestock farming. The property owner had put a dog kennel on the property, and the federal government challenged whether dogs can be considered livestock and were properly approved or properly, that's allowed under the deed. The district court agreed with the government's decision that livestock doesn't include dogs. And the Ninth Circuit actually overruled that. It found that the term livestock is extremely broad and that it is unambiguous as to whether it includes dogs. Now, no one would argue that poultry are certainly much closer to the idea of livestock than a dog would ever be. So in the merits of this case, I think the Ninth Circuit's decision is extremely instructive that defendants' argument that the term livestock is just so obvious that it excludes poultry, well, the Ninth Circuit has firmly rejected that decision. If I could just quickly raise the second issue that our argument is first that the district court wrongly decided that the term livestock unambiguously excludes poultry. Our second argument, though, is that even if the court had found the term to be ambiguous, that the court incorrectly didn't remand the decision to the USDA. This is an issue that USDA has never actually explained its position on. This is a statute that, when most people read it, would assume that the term livestock applies to poultry. Yet USDA has never provided an explanation of its interpretation in this case. We ask that the court first reject the district court's decision under the Chevron Step 1 standard. However, the court does find it ambiguous that the court remand to the agency for further explanation of the term livestock by the agency. I'd like to reserve the rest of my time for rebuttal, please. Roberts. Thank you. Roberts. Mr. Whitaker. May it please the Court. Henry Whitaker on behalf of the Secretary of Agriculture. I think I should begin with standing. As Judge Reimer and Judge Wu's questions were indicating, there's no standing the plaintiffs don't have standing in this case because their injury isn't redressable, because Congress in 1978, when it enacted the second Humane Methods of Slaughter Act, expressly repealed the only mechanism, only stand-alone mechanism for enforcing the Humane Slaughter Act of 1958. And as Judge Wu recognized, as Judge Wu sort of suggested, there's no way that we could do anything that would induce poultry producers to comply with any declaration by this Court that under the 1958 Act that poultry are unambiguously livestock. Now, there is, in 2005, Congress did amend the Federal Meat Inspection Act to give the Secretary discretion to add, let me go to the language here, any additional species of livestock the Secretary deems appropriate to the amenable species that are covered by the Meat Inspection Act. But the Secretary would most certainly, even if this Court declared that poultry were unambiguously livestock, I can tell you today that the Secretary would most certainly not exercise that discretionary authority to make poultry subject to the Meat Inspection Act, because what the effect of that would be would be to subject poultry which are currently subject to an entirely distinct regulatory scheme under the Poultry Products Inspection Act would be to subject them to various distinct and conflicting obligations under the statute. And that's not something that can't be done. Roberts. What would the conflicting obligations be? Well, let me just give you an example. One of the principal differences between the way the Poultry Products Inspection Act works and the Meat Inspection Act is antemortem inspection, that is, inspection before slaughter. And what the Meat Inspection Act provides is that every — is that for traditional livestock, each animal must be inspected individually prior to slaughter, whereas the Poultry Products Inspection Act gives the Secretary discretion to impose a sort of wholesale lot-by-lot inspection prior to slaughter. And that's — that's particularly significant when it comes to humane slaughter requirements, because when Congress enumerated the animals that were subject to the Humane Slaughter — Methods of Slaughter Act of 1958, it picked those animals that were subject to that inspection regime under the Meat Inspection Act. It specifically enumerated animals that were subject to the Meat Inspection Act. And so what the consequence of subjecting poultry to the Federal Meat Inspection Act would be would be to require an individual — individualized inspection regime. And if it is true, you know, plaintiffs talk about — plaintiffs talk about in their report 9.2 billion animals, poultry animals that are slaughtered for food every year. That's 9.2 billion individual inspections. And the Secretary would most certainly not exercise that discretionary authority. And I'm happy to answer questions about — Those references — you're referring to what citations for that inspection regime? Where are they located? Oh, the inspection regime? Well, the inspection regime in the Federal Meat Inspection Act is currently codified as — Is that in your brief? Is it in your brief? Oh, yes. Yes, Your Honor. It is in our brief. Thank you. In the statement of our — in the statement of the case where we sort of go through and explain the statutory scheme. And, I mean, really, as Judge Patel recognized in her order, this case is — is about two distinct statutory regimes that Congress has created, one on the one hand for poultry in the Poultry Products Inspection Act, and on the other hand for traditional livestock under the Federal Meat Inspection Act. And Congress has specifically excluded any kind of humane slaughter provision in the Poultry Products Inspection Act, and yet has included one in the Federal Meat Inspection Act. And as, you know, I think as Judge Patel recognized in her order below, that statutory scheme is extremely strong evidence that Congress understood poultry and livestock as used in the context of the 1958 Act and the 1978 Act to be distinct concepts and to mean that Congress expressly excluded poultry from the ambit of the humane — the Federal humane slaughter laws. We also, Your Honor, raise a threshold question in addition to standing of whether the notice that's being challenged here is final agency action. That is discussed in our brief, and I'm happy to answer any further questions the Court might have about that or on the merits, but unless the Court has further questions, we would simply ask that the judgment of the district court be affirmed. Thank you very much. Ms. O'Connell. O'Connell. Just a couple points, Your Honor. Defendant raises the Poultry Products Inspection Act. That Act is not before the Court. That Act is not at issue here. The Act at issue here— Wasn't the notice that was issued based on that? In other words, the notice that you basically said gives rise to this suit was based upon the PIA, the PPIA, wasn't it? Yes. Your Honor, the notice that we're challenging, what it says is USDA has received numerous comments from the public, 20,000 comments, and from Congress expressing concern about poultry slaughter and what USDA is doing about it. It says in response, importantly, there's no Federal requirements for us. There's nothing. The United Methodist Slaughter Act doesn't require us to do anything. And it goes on to say, but, you know, incidentally, under the Poultry Products Inspection Act, there are some things that we're already doing that, you know, are nice for poultry. That's not what this case is about. This case is about the decision of the agency that poultry aren't under the — that poultry don't have any requirements under Federal law. What this case is about is the 1958 HMSA. This is a list with an open list of animals, six species and other livestock. The Federal Meat Inspection Act, on the other hand, is a closed set of animals. It has been a closed set of animals since it was passed in 1907. What we're asking this Court to do is to look at these two different statutes and treat them differently. The Humane Methodist Slaughter Act includes much broader — it applies much more broadly than the narrow list under the Federal Meat Inspection Act, and the district court recognized that. If you were to prevail in this case, we would have to write an opinion explaining why Judge Patel was wrong. Now, could you tell us in about ten lines why she was wrong? Sure, Your Honor. First, the term livestock, under the dictionary definitions of 1958, plain language applies to poultry. Plain and simple. That's her first mistake. Second, even if the Court doesn't find the language is plain, the Court looked to legislative history and to other methods of interpreting the statute. When we're under Chevron Step 1, we have to look for Congress's unmistakable intention. We have to figure out what Congress undoubtedly intended. And if we look at these other things, particularly the muddled legislative history here, it's an exercise of, as Justice Scalia said, looking over a crowd and picking out your friends. That's not appropriate under Chevron Step 1. We don't find Congress's unmistakable intent from looking through that legislative history. So then we'd – if the Court does find the term is ambiguous, we would then have to look at whether it's arbitrary and capricious. I think there's no question that it is. There's no explanation in the agency's notice or anything the agency has put before this Court. If I could just very quickly, Your Honor, respond on the redressability issue. Now, USDA does not deny that it has enforcement authority under the 2005 amendments of the Federal Meat Inspection. I think that's important. USDA doesn't deny. It just says it's not likely to use that enforcement authority. This puts this case directly under the Supreme Court's Aikens case. In that case, the Court found that even though the agency had said, yes, we have enforcement authority, but we may never use it, the Court said that doesn't matter. You have redressability regardless. There's also this issue of procurement. As we've argued in our brief on page 7, every – excuse me – every Federal contractee has to sign a contract, and the Federal acquisition regulations require this as well. Every Federal contractee has to ensure that they will meet all Federal laws and regulations. So even if everyone else decides to ignore this requirement of Federal law, it is still enforceable through the Federal government's procurement requirements. USDA recently, in a case called Hallmark, filed a case against a beef slaughterer for violating the humane requirements of the Humane Methods of Slaughter Act because this was a Federal contractee selling to the national school lunch program. So there are other ways that USDA can ensure compliance. I should add that Federal contracts are entirely enforceable by the public under the Federal Claims Act. So this is a case where there is enforcement authority. Now, whether the agency decides to use it or not, it doesn't matter under the Aikens case, and it also doesn't matter under the Ninth Circuit's cases that say that this is in compliance with the law. Anything else? Okay. Thank you, Your Honors. That does it. Thank you both for your argument. The matter just argued will be submitted, and the Court will send in recess for the
judges: Wu, Goodwin, Rymer